**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| MICHAELA DOUGLASS-USOV, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br> v.<br><br>Unknown Business Entity d/b/a OpiA,<br><br>      Defendant. | Case No. 3:25cv307<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michaela Douglass-Usov ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Unknown Business Entity, doing business as OpiA ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.   This is a civil class action against Defendant for its false, misleading, deceptive, and negligent sales practices regarding its 7-Hydroxymitragynine ("7-OH") products[1] ("7-OH Products") and 7-Hydroxymitragynine + Pseudo Indoxyl Products[2] ("7-OH+ Products," collectively, "the Products").

2.   7-OH is an alkaloid (psychoactive chemical) found in the kratom plant (*mitragyna speciosa*). Mitragynine Pseudoindoxyl is a metabolite of mitragynine, the primary alkaloid found

---

[1] This includes Defendant's 7-Hydroxymitragynine tablets and 7-Hydroxymitragynine Liquid Shots.

[2] This includes Defendant's Pseudo Indoxyl + 7-Hydroxymitragynine tablets, and Pseudo Indoxyl + 7-Hydroxymitragynine Liquid Shots.

in the kratom plant. The plant originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects. Use of kratom in the United States was practically non-existent until the last decade. Since then, kratom has become a massively popular substance. This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its two major alkaloids: 7-OH and mitragynine.

3.    However, what consumers do not know is that the opiate-like effects produced by mitragynine and 7-OH are not the result of novel chemical interactions in the brain. Rather, these alkaloids behave, in part, exactly like opioids. That is, the mitragynine and 7-OH alkaloids found in the kratom plant bind to the same opioid receptors in the human brain as morphine, heroin, and other opiates/opioids.[3]    Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects as traditional opioids.

4.    But it gets worse. While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine. Indeed, some studies have shown that 7-OH is ten times more potent than morphine in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction. Similarly, Pseudoindoxyl is three to five times more potent than morphine in activating the mu-opioid receptor.

5.    7-OH and Pseudoindoxyl do not appear in great quantities in raw kratom. 7-OH makes up less than 0.05% of kratom powder by weight and Pseudoindoxyl is found only in trace amounts. For raw kratom powder consumers this means that normal doses of kratom powder do not contain enough 7-OH or Pseudoindoxyl to produce the intense narcotic effects (and

---

[3] An opiate is a substance derived from opium whereas an opioid is any substance that binds with the mu-opioid receptor.

concomitantly strong withdrawals) characteristic of traditional opioids. This is not to say that kratom can be consumed with abandon—kratom is highly addictive and will induce opioid withdrawal symptoms if taken too frequently—rather, this is to say that in comparison to raw kratom addiction, the withdrawal symptoms from pure 7-OH and Pseudoindoxyl consumption will be substantially worse.

6.    Defendant does not sell raw kratom. Defendant's 7-OH Products are pure 7-Hydroxymitragynine. 20mg of it to be precise. Defendant's 7-OH+ Products are 50/50 pure 7-Hydroxymitragynine and pure Pseudoindoxyl. 10mg of each. This makes Defendant's Products more addictive than kratom, and the withdrawal symptoms significantly worse.

7.    Almost as soon as 7-OH hit the market the horror stories began to surface. Consumers stating that they were blindsided by these products, thinking they were just a different form of kratom, and suffering through the worst withdrawal symptoms they had ever experienced – worse than heroin by some accounts.

8.    The general public is largely unaware of kratom and its addictive potential. So, when it comes to "7-Hydroxymitragynine," a derivative of kratom with a torturously complex name, the public is even less aware of it and its negative effects.

9.    When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine—they do not think of 7-OH or expect the "kratom alkaloid" product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids. 7-OH is extremely addictive and, as a result, tens of thousands of unsuspecting consumers have developed 7-OH dependencies that have caused them serious physical, psychological, and financial harm.

10.    Defendant has intentionally failed to disclose these material facts regarding the dangers of 7-OH consumption anywhere on its Products' labeling, packaging, or marketing material.  As a result, Defendant has violated warranty law and Virginia consumer protection laws.

11.    Defendant relies on its Products' vague packaging and consumers' limited knowledge of 7-Hydroxymytragynine to get unsuspecting people addicted to its Products and reap substantial profits from these addictions.  Defendant relies on this ignorance and does almost nothing to correct it.   Such activity is outrageous and is contrary to Virginia law and public policy.

12.    Plaintiff seeks relief in this action on behalf of herself, and as a class action, on behalf of similarly situated purchasers of Defendant's Products, for the following violations of: (i) Virginia's Consumer Protect Act VA. Code Ann. § 59.1-196, *et seq* (the "VCPA"); (ii) breach of implied warranty; (iii) unjust enrichment; and (iv) fraud by omission.

## PARTIES

13.    Plaintiff Michaela Douglass-Usov is a citizen and resident of Hopewell, Virginia. She first purchased Defendant's Products in or around October 2023, during which time she was a resident of Virginia.  Plaintiff Douglass-Usov purchased Defendant's Products from a smoke shop in Virginia.  Plaintiff Douglass-Usov did not believe the Products to be harmful and was not aware that Defendant's Products carried a potential risk of being addictive.  Plaintiff Douglass-Usov reviewed the Products' packaging before making her purchase and relied on Defendant's representations in deciding to purchase the Products.  A warning on the Products packaging would have corrected her belief, but there was none.  Plaintiff Douglass-Usov began by using daily tablets because she had no reason to believe the tablets were habit-forming or that she was developing physical dependence on them.  After a week of this use, Plaintiff Douglass-Usov Realized she was addicted when one day she did not take Defendant's tablets and began experiencing withdrawal

systems including muscle aches, hot and cold flashes, nausea, and insomnia. Plaintiff Douglass-Usov had never experienced anything like that before. This was the moment Plaintiff Douglass-Usov realized Defendant did not tell the truth about its Products, and that she had become addicted to them. Had Plaintiff Douglass-Usov known that Defendant's Products were highly addictive, or posed a risk of addiction, by way of a warning on the Products' packaging, she would have never purchased them.

14.     The identity of Defendant Unknown Business Corporation is unknown to Plaintiff at this time. Defendant owns and operates the website www.opiakratom.com/, and also advertises, markets, distributes, and sells its Products in Virginia and throughout the United States. Defendant intentionally conceals its true identity to further its false and deceptive business tactics.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and at least some members of the proposed Classes, have a different state citizenship from Defendant.

16.     This Court has personal jurisdiction over Defendant because Defendant is an entity with constitutionally sufficient contacts with this District to make personal jurisdiction in this Court proper.

17.     Venue is proper in this District and Division because Defendant sold its Products to consumers in this District and Division, and because Plaintiff was harmed by Defendant's actions in this District and Division.

## FACTUAL ALLEGATIONS

**A.     Background and Pharmacology of Kratom and 7-Hydoxymitragynine**

18.     "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

19.     Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[4]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

20.     Kratom's variable effects have historically been part of its appeal.  For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

21.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

---

[4] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

22.    To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[5]

23.    The chemicals in the kratom plant, which produce a psychoactive effect when ingested, are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

24.    MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

25.    Defendant's Products are unique as compared to most other kratom products on the market and represent a "next-gen" iteration of the substance in terms of addictiveness and harm-potential.  They are an isolated and concentrated version of kratom, making 7-OH the primary active alkaloid and stripping the rest away.

26.    Compared with raw kratom, 7-OH typically only occurs in doses that are no greater than 2% of total alkaloid content (or 0.05% by weight).  In Defendant's 7-OH Products, however, 7-OH makes up 100% of the total alkaloid content.  Similarly, in raw kratom, Pseudoindoxyl only occurs in trace amounts, but Defendant's 7-OH+ Products are 50% Pseudoindoxyl AND 50% 7-OH.

---

[5] When kratom leaves are extracted into a liquid formulation, it is colloquially called a kratom "extract shot."

27.    7-OH is different than MG because, although both interact with the mu-opioid receptor,[6] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH has an affinity for the mu-opioid receptor that is comparable to—or greater than—opioids like Percocet, morphine, and oxycontin.  Studies have shown that when 7-OH is administered in concentrated, isolated doses, it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom.  Yet, consumers are largely ignorant of this fact.

28.    For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[7]  Similarly, Pseudoindoxyl is three to five times more potent than morphine in activating the mu-opioid receptor.

29.    Thus, kratom is by definition an "opioid," and so is 7-OH.

30.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms, which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

31.    All substances that act on the opioid receptors have a high risk of addiction, and 7-OH is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the

---

[6] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor that all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[7] *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

32.    Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal.  These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, stomach pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

33.    Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal.  Use is no longer about getting high, but about not feeling "sick."

**B.    Background and Pharmacology of Kratom and 7-Hydroxymitragynine**

53.    Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States.  Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

54.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United

States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

55.     7-OH is new to the market.  Having only arrived in 2022 or even more recently.

56.     Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.  This is doubly true of 7-OH.  Even if consumers have heard of kratom they may not have heard of 7-OH.

57.     7-OH sellers advertise it as a substitute for coffee or a kratom derivative of equal potency, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. Some even assure consumers that 7-OH is a non-addictive way to deal with opioid withdrawal. These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of its corresponding harms.

58.     As a result of 7-OH manufacturers', retailers', and advertisers' failure to warn consumers of 7-OH's addictive potential, many 7-OH users find themselves blindsided when they stop taking 7-OH and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because 7-OH is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some 7-OH users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

59.     The reports from people addicted to 7-OH are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to 7-OH, and how difficult it was to stop their 7-OH use.  Below are several accounts

from the "Quitting Kratom" forum on www.reddit.com, which has over 47,000 members as of

January 2025:[8]

    i.    In one post titled **Do no take 7oh**, a user wrote: I'm going to say this loud and clear for everyone in their early stages of quitting, currently, or have already quit. DO NOT take this 7oh shit. It's fucking poison. It's nothing like the extracts and it's a very VERY taxing drug on the body. I have done every single thing under the sun and I can honestly say with confidence that this is by far bar none the absolute worst drug I've ever taken when it comes to detoxing.

    ii.    In another post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:** I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like [7-OH] might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using [7-OH] though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

    a.    **Another user responded**: I don't know how you're cold turkey from [7-OH], I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The [7-OH] withdrawal is very scary, worse than any opiate I've been on.

    b.    **Another User Responded**: I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

    iii.    In separate post another user wrote: Guys I desperately need help. I have been taking [7-OH] for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really

---

[8] *See* https://www.reddit.com/r/quittingkratom.

long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

    iv.    In another post titled **Could not and would not believe you all…**another user wrote: Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the [7-OH] tablets, a full pack of three a day. I told myself you were all exaggerating.  I told myself you were all weak. Now I'm completely humbled and fully ashamed.  The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse.  And I caved.  I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed.  I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop." I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared.  If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high.  There's so much more to life than getting high.  Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏

    60.    The reviews of Defendant's Products in particular are horrifying, with one post

entitled **Opia (7ohm) is killing me**:

I tried my first chewable tablet of Opia some time in late October or early November after seeing a 'new product' sticker next to the kratom I would buy in the headshop.

I took half of one as per the recommended dose.  Prior to taking this I was up to roughly 20-30g/day of powder depending on the day.  The first hit was relatively quick and it was like taking kratom again for the first time.  Not only that but it was like taking an actual opioid/opiate (something I have been very familiar with in the past).

It was amazing **and I was instantly hooked**.  Tolerance grew pretty fast.  I was taking about 6-7/day after the first week or so.  That got up to 7,8,9/day.  That

lasted a few weeks and then I started having powder kratom first, digest it a little bit then pop the Opia because the mix was a good high but I didn't want to keep piling more and more chewables on.  I was taking 2 full tablets at a time on top of 7-10g of powder in one dose. I would take a third tablet about 30-60 minutes after that to extend the high.  Something you can't do with powder kratom because of the plateau effect.

So on my worst day I took maybe 13 tablets and 25g of powder in one day. I have a naturally high tolerance to pretty much all substances so that's a factor in my dosages.

Starting yesterday I took my normal 2 tablets after my morning kratom tea (when I say powder this is how I always consume it) of 7.5g.  Took a third tablet the normal duration later.  Then I started to feel like I was going to pass out. My breathing was fine, no nausea, nothing. Just felt really shitty all of a sudden. I got up off the couch and walked around and that helped.  My legs and arms got really shaky like my blood sugar dropped (I don't have diabetes or anything like that) and I felt weird for an hour or two but it dissipated and I thought it was just a fluke.  Prior to this happening I had never had any negative side effects from the 7OHM.

I wrote it off and took my normal powder and 2 chewable tablets dose a few hours after the morning dose as usual and it really hit me in a not good way.  I felt like I was going to have to go to the hospital or something.  I felt weak.  I was nauseous.  My heart felt off.  I couldn't really eat despite being hungry.  I felt like I could pass out at any moment.  It took a lot of work to try to feel better which was walking and doing different breathing exercises.  I still don't know what's happening.  I just know i need to stop.

So when I finally calmed down last night I took some powder and one chewable so I would be able to sleep last night (tried sleeping without them? Or without kratom at all? It fucking sucks.).  I was feeling weird again but only having one chewable the problems weren't as pronounced.  Then I ate a banana to help with the queeziness and immediately threw up the kratom and banana.

Luckily with what was happening in my body I was able to get some sleep despite not having nearly as much kratom as my body is used to.  I took the powder again and one tablet this morning and when I felt it start to kick in I felt the same sort of dizziness and general feeling of something not being right in my body.

Suffice it to say I'm not going to be taking them anymore from here on out. Maybe one tonight to help sleep and then I'm off of them tomorrow and back to only powder until I can come off kratom altogether.

I know my daily dosages of this stuff were ridiculously high but my body finally caught up with me.  Please do yourself a favor and stay away from the 7OHM

stuff. I have a lot of work ahead of me to fix any damage I did to my body this past month and a half. Not to mention the money I spent just to nearly kill myself. Luckily I avoided going to the hospital because that would've been another financial burden I'd have to bear but I'm listening to my body and not trying my luck with this shit any further.

61.    Other experiences with kratom (not necessarily 7-OH products) described on the subreddit are similarly horrifying:

> **One user wrote:** I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

> **Another user shared:** I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

> **Another user shared:** I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly… Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the

14

injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

62.    This Internet forum is filled with other accounts like these, and the stories are consistently the same: well-meaning people were looking to feel better by taking what they thought was an "herbal supplement," only to develop an opioid-like addiction.  This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.  However, Defendant's Products have no information whatsoever warning that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

34.    Consumers who knew the truth about 7-OH would not have purchased Defendant's Products.

## C.    Defendant Knew or Should Have Known They Were Selling a Highly Addictive Drug to Unsuspecting Consumers

63.    Defendant manufactures its Products in a highly specialized lab and utilizes highly technical knowledge about kratom and its alkaloids to synthesize its Products.  Thus, Defendant is acutely aware of the addiction risks posed by its Products.

64.    Despite this knowledge, Defendant failed to disclose 7-OH's addictive potential to its customers on its Products' packaging.

65.    Defendant has no excuse for its lack of a detailed disclaimer warning on its Products' packaging of 7-OH's harms.  The pharmacological effects of 7-OH have been studied,

and it is well-established that 7-OH acts on the same mu-opioid receptors in the brain as traditional opioids do.  Further, there are widespread reports and studies of other addiction and dependency issues.

66.     Defendant therefore knew or should have known that kratom and kratom-derivative users can develop an addiction.  Yet, Defendant fails to disclose this material fact on its advertisements or on its Products' packaging.

67.     The very fact that Defendant possesses the capability to manufacture its Products shows that it understands the pharmacokinetic nature of 7-OH and the substantial risk of addiction that it poses to consumers.  Despite this, Defendant markets its Products as if they are nothing more than over-the-counter supplements.  Indeed, the packaging looks more like candy than a dangerously strong opioid, and Defendant's glossy website and design language obfuscates the very truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.



Float Away and Find Your Inner Calm

Discover the transformative power of Mitragyna speciosa, better known as kratom. OPiA invites you to embrace a serene lifestyle where you can rise above the weight of everyday physical and mental stress. Feel lighter, as if living in the clouds, and let yourself float away into tranquility.

68.     For instance, in the image pictured below, taken from Defendant's website, Defendant gives customers a wink and a nod that its Products helps people to "[f]eel lighter, as if living in the clouds, and let yourself float away into tranquility."  Like Plaintiff's experiences

described below, consumers may walk into the local headshop and see Defendant's Products and be enticed into purchasing them because, they think, it looks inviting and if it was dangerous there would be a warning on the package.

69.    It gets worse.  Defendant's business name and the color and shape of its original blue tablet Products are an overt nod to counterfeit oxycodone tablets.  These tablets are known as "M30's," "pressies," or "blues."  Comparison images between street oxycodone and Defendant's blue Raspberry tablets are reproduced below.  On the left is a photograph of illegal oxycodone ("blues").  On the right is Defendant's Product.  The shade of blue is nearly identical.  This is outrageous, a moral and ethical failure, and in contravention of public policy.




*A comparison between illegal "street" oxycodone and Defendant's Blue Raspberry Product*

70.     Aside from people well versed in street-level drug activities, reasonable consumers looking at the Products' packaging and online store description would not presume that 7-OH is highly addictive.

71.     Nowhere on the packaging does Defendant mention that 7-OH presents the same addiction risks or problems that former opioid users and any other consumers would want to avoid. Consumers seeking help as they come off opioids may be drawn in by Defendant's misleading statements about 7-OH without knowing that they risk trading one addiction for another.

72.     As a 7-OH product seller, manufacturer and/or distributor, Defendant occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH.

73.     Aside from the Blue Raspberry tablets, Defendant also markets and sells 7-OH Tablets in the following flavors: Classic, Sour Apple, Mintopia, and Wild Cherry.



**Classic**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



**Sour Apple**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



**Blue Raspberry**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



**Mintopia**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



**Wild Cherry**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



74.    Defendant also sells 7-OH Shots, 7-OH + Pseudoindoxyl Tablets, and 7-OH + Pseudoindoxyl Shots.



**Classic**
30mg Total
10mg Per Serving
Serving Size 1/3 of Bottle = 10mg



**Bluberry Lemonade**
30mg Total
10mg Per Serving
Serving Size 1/3 of Bottle = 10mg



**Raspberry Peach**
30mg Total
10mg Per Serving
Serving Size 1/3 of Bottle = 10mg



**Strawberry Watermelon**
30mg Total
10mg Per Serving
Serving Size 1/3 of Bottle = 10mg



**Mango Strawberry**
30mg Total
10mg Per Serving
Serving Size 1/3 of Bottle = 10mg



*7-OH Shots*



**Classic**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



**Wild Berry**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg



**Spearmint**
80mg Total
20mg Per Tablet
Serving Size 1/2 Tablet = 10mg

*7-OH + Pseudo Indoxyl Tablets*



*7-OH + Pseudo Indoxyl Shots*

75.    On Defendant's website homepage, it markets its Products as the following:

"Experience the unparalleled power of 7-Hydroxymitragynine, a remarkable alkaloid derived from the kratom plant.  OPiA's liquid shots, chewable tablets, and curated samplers offer a groundbreaking way to unlock calmness, balance, and a new level of well-being."

"7-Hydroxymitragynine is a potent natural alkaloid found in the kratom plant. With this, 7-Hydroxymitragynine offers a unique and revolutionary experience to those who can benefit from its exceptional properties.  Enjoy the pinnacle of kratom with OPiA liquid shots and chewable tablets."

"As a relatively new product in the kratom market, 7-Hydroxymitragynine is often misunderstood.  OPiA's Mission is to enlighten our customers on what makes 7-Hydroxymitragynine unique and provide this revolutionary product to those who can truly benefit from its exceptional properties."

76.    In these descriptions, Defendant touts all the potential benefits of its Products but fails to disclose on the Products' packaging the heightened harm and additional risk of addiction that corresponds with the increased potency of its Products.  Indeed nowhere did Defendant provide any warning to consumers on the Products' packaging that its Products interact with opioid receptors, are highly addictive, or have a potential risk of addiction, and should not be taken on a daily basis, or note any of the numerous negative side effects and withdrawal symptoms caused by its Products.

77.    The only place Defendant ever indicates that there is any possibility of addiction is in small font that is hidden at the very bottom of its website, which consumers are unlikely to visit because the Products are exclusively sold in smoke shops or other website but not directly from the OpiA website.  This reads: "This product contains kratom.  Kratom may be addictive.  Product not intended for daily use."  However, this disclaimer does not appear on the Products' packaging or on the websites of any third parties who sell the Products.

78.    No where on the Products' packaging is any disclaimer that the Products may be harmful to a consumers' health.  Indeed, the packaging merely reads: "This product has not been evaluated by the FDA, and is not intended to diagnose, treat, cure, or prevent any disease."  *See* Figures on next page.



## Feel *Lighter*

7-Hydroxymitragynine is a potent alkaloid found in the kratom plant. At OPiA, we've harnessed its remarkable capabilities to create a product that offers unparalleled euphoria and relief, surpassing any regular kratom supplement. Experience the pinnacle of natural wellness with every tablet.

**10mg**
**10mg**

### Serving Size: *1/2 Tablet – 10mg*

**For adult use only. Keep out of reach of children. Underage sale prohibited. Must be 21+ to purchase.**

### Perforate Here

Tablet Ingredients:
7-Hydroxymitragynine,
Microcrystalline Cellulose, Dicalcium
Phosphate, Silicon Dioxide, Magnesium
Stearate, Food Grade Colorant

**FDA DISCLAIMERS:** THESE PRODUCTS AND STATEMENTS HAVE NOT BEEN EVALUATED BY THE FDA AND ARE NOT INTENDED TO DIAGNOSE, TREAT OR CURE ANY DISEASE. DO NOT CONSUME THIS PRODUCT IF PREGNANT OR NURSING. CONSULT A DOCTOR BEFORE CONSUMING THIS PRODUCT. DO NOT OPERATE HEAVY MACHINERY AFTER CONSUMING THIS PRODUCT.

Exp:09-26
N04286

Live lightly
with us

**MITRAGYNA SPECIOSA DISCLAIMER:** THIS PRODUCT CONTAINS NATURALLY OCCURRING PLANT COMPOUNDS FROM MITRAGYNA SPECIOSA (KRATOM). THE INTOXICATING EFFECTS OF KRATOM MAY BE DELAYED UP TO TWO HOURS. DO NOT CONSUME MORE THAN THE RECOMMENDED AMOUNT.

**LEGAL DISCLAIMER/LIABILITY DISCLAIMER:** BY USING THIS PRODUCT, YOU ASSUME FULL RESPONSIBILITY FOR ANY ADVERSE EVENTS AND/OR HEALTH COMPLICATIONS THAT MAY RESULT FROM ITS USE. MANUFACTURER/RESELLER ASSUMES NO LIABILITY FOR THE MISUSE OF THIS PRODUCT.

**FDA DISCLAIMERS:** THESE PRODUCTS AND STATEMENTS HAVE NOT BEEN EVALUATED BY THE FDA AND ARE NOT INTENDED TO DIAGNOSE, TREAT OR CURE ANY DISEASE. DO NOT CONSUME THIS PRODUCT IF PREGNANT OR NURSING. CONSULT A DOCTOR BEFORE CONSUMING THIS PRODUCT. DO NOT OPERATE HEAVY MACHINERY AFTER CONSUMING THIS PRODUCT.

53.    A boilerplate disclaimer is plainly insufficient.  This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

54.    Indeed, the Commonwealth of Virginia requires more.  Specifically, the packaging must have a disclaimer reading: "This product **may be harmful to your health**, has not been evaluated by the FDA, and is not intended to diagnose, treat, cure, or prevent any disease."  Defendant does not include such a disclaimer.

55.    Addiction is a disease.  As such, Defendant's Products pose an unreasonable health hazard, and Defendant had and has a duty to disclose this fact ***on its Products' packaging.***

56.    What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.  It looks as innocuous as a vitamin supplement.

57.    Defendant, through its misleading advertising and its failure to disclose 7-OH's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of 7-OH to better sell its Products and get users addicted to them.

58.    Defendant fails to disclose 7-OH's addictive potential because Defendant knows that it is a material fact to reasonable consumers that would influence their purchasing and consumption decisions, likely to Defendant's financial detriment.

59.    By any metric, Defendant's conduct is immoral, unethical, and contrary to Virginia public policy.

60.    The United States is currently experiencing an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosure of its Products' risks through the use of false and misleading packaging and marketing.  That cannot—and should not—stand, at least when

Defendant's conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

61.     Accordingly, because the facts concern a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Products and to disclose the Products are—or potentially are—addictive.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Products as the owner, manufacturer, producer, marketer, and seller of the Products.  Nonetheless, Defendant concealed this material information.

## <u>CLASS ALLEGATIONS</u>

62.     Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself  and all other Class members, defined as follows:

> All persons nationwide who, within the applicable statute of limitations period, purchased OpiA's 7-hydroxymitragynine products or 7-hydroxymitragynine + pseudoindoxyl products (the "Nationwide Class").

> All persons who, within the applicable statute of limitations period, purchased OpiA's 7-hydroxymitragynine products or 7-hydroxymitragynine + pseudo indoxyl products while in Virginia (the "Virginia Subclass").

63.     Excluded from the Classes are Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of its respective officers, employees, agents or affiliates, and any judge who presides over this action.  Plaintiff reserves the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection with their motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

64.    *Numerosity*: The members of the Classes are so numerous that joinder of all members is impracticable.  Plaintiff is informed and believes that the proposed Classes contain at least thousands of consumers throughout Virginia and the United States who have been damaged by Defendant's conduct as alleged herein.  The precise number of members of the Classes is unknown to Plaintiff at this time.

65.    ***Existence and Predominance of Common Questions of Law and Fact***:   This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

    a.  whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

    b.  whether Defendant knew that 7-OH is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

    c.  whether Defendant had a duty to disclose that 7-OH is addictive on its Products' packaging;

    d.  whether Defendant's conduct alleged herein violated the VCPA;

    e.  whether Defendant's conduct alleged herein constitutes unjust enrichment;

    f.  whether Defendant's conduct constitutes a fraudulent omission;

    g.  whether Plaintiff and the Classes are entitled to damages and/or restitution; and

    h.  whether an injunction is necessary to prevent Defendant from continuing to sell its Products without warning labels of its addictiveness or risk thereof.

66.    *Typicality*: Plaintiff's claims are typical of the claims of the Classes in that Plaintiff and the Class members sustained damages as a result of Defendant's uniform wrongful conduct,

based upon Defendant's failure to inform Plaintiff and all others similarly situated that its Products are highly addictive, or pose a risk thereof, and are akin to opioids.

67.    **_Adequacy_**: Plaintiff will fairly and adequately protect the interests of the members of the Classes.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no antagonistic or adverse interests to those of the Classes.

68.    **_Superiority_**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, _inter alia_, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

69.    Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

70.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff, members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of its wrongdoing.

71.    Based on the forgoing allegations, Plaintiff's claims for relief include those set forth below.

## CAUSES OF ACTION

### COUNT I
### Violation of the Virginia Consumer Protection Act ("VCPA")
### VA. Code Ann. § 59.1-196, *et seq.*
### (On Behalf of the Virginia Subclass)

35.　　Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs.

36.　　Plaintiff brings this cause of action individually and on behalf of the members of the proposed Virginia Subclass against Defendant.

37.　　Under the VCPA, Plaintiff, members of the Virginia Subclass, and Defendant are all "persons" within the meaning of VA. Code Ann. § 59.1-198.

38.　　The Products are "goods" within the meaning of VA. Code Ann. § 59.1-198.

39.　　The Products are "kratom" within the meaning of VA. Code Ann § 59.1-200(77) because they are derived from "any part of the leaf of the plant Mitragyna speciosa or any extract thereof."

40.　　Defendant was, and is, engaged in "consumer transactions" within the meaning of VA. Code Ann. § 59.1-198.

41.　　The VCPA prohibits "fraudulent acts or practices committed by a supplier in connection with a consumer transaction[.]" VA. Code Ann. § 59.1-200(A).

42.　　Defendant's Products pose an unreasonable health hazard because 7-OH is highly addictive and may induce serious withdrawal symptoms. Accordingly, Defendant had a duty to consumers to disclose on the Products' labels that its Products pose a risk of physical and psychological dependence.

43.　　Defendant owed Plaintiff and members of the Virginia Subclass a duty to disclose the true safety of its Products and its failure to do so violates the VCPA. Specifically, in

marketing, offering for sale, and selling the Products without warning of their extremely addictive nature, Defendant engaged in the following unfair or deceptive acts or practices prohibited by the VCPA:

(a)     Representing that the Products have characteristics that they do not have;

(b)     Representing that the Products are of a particular standard and quality when they are not;

(c)     Advertising the Products with the intent not to sell them as advertised;

(d)     Selling addictive substances to unsuspecting consumers and profiting from their addiction;

(e)     Engaging in any other deception, fraud, false pretense, false promise, or misrepresentation that had the tendency to mislead consumers; and

(f)     Selling kratom that does not include the following disclaimer: "This product may be harmful to your health, has not been evaluated by the FDA, and is not intended to diagnose, treat, cure, or prevent any disease."

Va. Code Ann. §§ 59.1-200 (A) (5), (6), (8), (14), and (77).

44.     Defendant has known of the addictive nature of its Products and failed to disclose and actively concealed the dangers and risks posed by the Products.

45.     Defendant disseminated uniform advertising regarding its Products to and across Virginia.  This advertising was, by its very nature, unfair, deceptive, untrue, and misleading.  Such advertisements were intended to, and likely did, deceive the consuming public for the reasons detailed herein.

46.     By failing to disclose and by actively concealing the addictive nature of the Products, by marketing them as safe, reliable, and of high quality, and by presenting themselves

as reputable manufacturers that value safety, Defendant engaged in unfair and deceptive business practices in violation of the VCPA. Defendant deliberately withheld the information about the propensity of the addictive nature of the Products.

47. Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression to consumers, were likely to and did, in fact, deceive reasonable consumers, including the members of the Virginia Subclass, about the true safety of the Products, the quality of Defendant's Products, and the true value of the Products.

48. Defendant intentionally and knowingly misrepresented, concealed, suppressed, and omitted facts regarding the addictive nature of the Products with the intent to mislead Plaintiff and members of the Virginia Subclass. Defendant knew, or should have known, that the Products were extremely addictive because Defendant has exclusive or superior knowledge of 7-OH's addictive nature, which was not known to Plaintiff or the Virginia Subclass members.

49. Defendant knew, or should have known, that its conduct violated the VCPA.

50. Plaintiff and Members of the Virginia Subclass relied on Defendant's representations and were induced to purchase the Products and as such suffered ascertainable loss caused by Defendant's misrepresentations and its failure to disclose material information. Had Plaintiff and Members of the Virginia Subclass been aware of the addictive nature of the Products, they would not have purchased them at all. Such injury is substantial and is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also Defendant omissions, consumers themselves could not have reasonably avoided such injury.

51.     Plaintiff and Members of the Virginia Subclass did not receive the benefit of their bargain because of Defendant's misconduct.

52.     Defendant's conduct was willful and in knowing violation of the VCPA, entitling Plaintiff to enhanced damages, including statutory damages, attorney's fees, and costs pursuant to Va. Code Ann. § 59.1-204.

53.     Pursuant to VA. Code Ann. § 59.1-204(A)-(B), Plaintiff and Members of the Virginia Subclass seek:

(a)     An award of actual damages or statutory damages of $500 per violation, whichever is greater, pursuant to Va. Code Ann. § 59.1-204;

(b)     An award of treble damages upon a finding of willful violations;

(c)     An award of reasonable attorney's fees and costs;

(d)     A declaration that Defendant's practices violate the Virginia Consumer Protection Act;

(e)     Injunctive relief prohibiting Defendant from engaging in further false and misleading advertising; and

(f)     Such other and further relief as the Court deems just and proper..

54.     Defendant has not yet been provided notice of the issues raised in this Complaint because at this time Plaintiff has been unable to ascertain the identity of Defendant due to its deceptive business practices.

## <u>COUNT II</u>
**Breach of Implied Warranty**
**(On Behalf of the Nationwide Class and Virginia Subclass)**

55.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

56.     Plaintiff brings this claim individually and on behalf of the Nationwide Class and Virginia Subclass against Defendant.

57.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that 7-OH is not addictive and does not cause opioid-like withdrawal symptoms because it did not provide disclosure on the Product's packaging stating otherwise.

58.    Defendant breached its warranty implied in the contract for the sale of its Products because the Products could not pass without objection in the trade under the contract description: the Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiff and the Members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive, are not potentially addictive, and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiff and the Members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

59.    Plaintiff and the Members of the Classes purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

60.    The Products were defective when they left Defendant's exclusive control.

61.    Plaintiff and the Members of the Classes did not receive the goods as warranted.

62.    As a direct and proximate cause of Defendant's breach of its implied warranty, Plaintiff and the Members of the Classes have been injured and harmed because (i) they would not have purchased Defendant's Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

63.    Defendant has not yet been provided notice of the issues raised in this Complaint because at this time Plaintiff has been unable to ascertain the identity of Defendant due to its

deceptive business practices.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and Virginia Subclass)**

64.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully stated herein.

65.     Plaintiff bring this claim individually and on behalf of the Members of the Classes against Defendant.

66.     Plaintiff and the Members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

67.     Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the Members of the Classes.

68.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Members of the Classes' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendant failed to disclose on the Products' packaging that the Products were addictive, or were potentially addictive, and similar to opioids.  This caused injuries to Plaintiff and the Members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

69.     Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the Members of the Classes.

70.     Defendant has thereby profited by retaining the benefit under circumstances that would make it unjust for Defendant to retain the benefit.

71.     Plaintiff and the Members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

72.     As a direct and proximate result of Defendant's actions, Plaintiff and the Members of the Classes have suffered in an amount to be proven at trial.

73.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiff would be left without the parity in purchasing power to which they are entitled.

74.     Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place she would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal

### COUNT IV
### Fraud by Omission
### (On Behalf of the Nationwide Class and Virginia Subclass)

75.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

76.     Plaintiff brings this claim individually and on behalf of the Members of the Classes against Defendant.

77.     Defendant distributed its Products throughout the United States, including within the Commonwealth of Virginia.

78.     Defendant misrepresented that its Products had attributes or qualities that they do not have by failing to disclose that 7-OH is addictive, or is potentially addictive, and can cause opioid-like withdrawal.

79.     Defendant knows that 7-OH is addictive because it employs a highly specialized lab to isolate and extract 7-Hydroxymitragynine from kratom, and because it has received consumer reports of addiction and withdrawal.

80.     Defendant knows that knowledge of 7-OH's addictive nature, or even potentially addictive nature is a material fact that would influence the purchasing decisions of reasonable consumers because addiction is an unreasonable health hazard.

81.     Defendant therefore had a duty to Plaintiff and to the Members of the Classes to disclose that 7-OH is addictive, or has a risk of being addictive, and can cause withdrawals on the Products' packaging.

82.     Consumers reasonably and justifiably relied on Defendant's omissions, because it is reasonable to assume that a product that is addictive, or has a risk of being addictive, like an opioid, would bear a warning on its packaging.

83.     As a result of Defendant's omissions, Plaintiff and the Members of the Classes paid for Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about 7-OH.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in her favor and against Defendant as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and;

(h)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: April  21, 2025                             Respectfully submitted,

                                  **SILVERMAN THOMPSON SLUTKIN WHITE**


                                  _____*/s/ Pierce C. Murphy*_____
                                  Pierce C. Murphy, Esq. (VSB #87842)
                                  Silverman Thompson Slutkin & White
                                  400 Pratt Street, Suite 900
                                  Baltimore, MD   21202
                                  (410) 385-2225 (p)
                                  (410) 547-2432 (f)
                                  pmurphy@silvermanthompson.com

                                  *Counsel for Plaintiff*